Charles S. McCullough, Jr., by his next friend and father, Charles S. McCullough, *v.* the Pittsburg, Allegheny & Manchester Traction Company, Appellant.

*Negligence—Street railways—Child of tender age—Electric cars.*

In an action against a street railway company to recover damages for injuries to a child of tender age, the case is for the jury where the evidence for the plaintiff, although contradicted, tends to show that the motorman saw the child within a sufficient distance to have stopped his car before striking the child.

· ·Argued Oct. 28, 1897. Appeal, No. 80, Oct. T., 1897, by defendant, from judgment of C. P. No. 2, Allegheny Co., Jan. T., 1896, No. 612, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Trespass for personal injuries to a child twenty-one months old. Before EWING, P. J.

At the trial it appeared that the plaintiff, Charles S. McCullough, Jr., on the evening of June 5, 1895, when he was twenty-one months old, was run over by a car of the defendant and so injured that his leg had to be amputated below the knee, and that his hand was so cut that three fingers had to be amputated. The circumstances of the accident are stated in the charge of the court, as follows:

[There are three questions of negligence that are raised by the pleadings: One is that the defendant was guilty of negli-gence in not having a fender to the car; well, there is no evidence to sustain that charge, it is negatived, so that is out of the way. The next question is a question of negligence in the rapid running of the car. We have affirmed a point of the defendant that there is no evidence to justify that finding. If we are wrong in that the Supreme Court will correct us, but you are to take your law from the court. It is a little difficult to tell just what may be the proper rule in regard to electric railways as to the rate of speed on public streets. It has become the method of travel for short distances, and especially in the cities and towns in the suburbs. It has become, in a ·few years, a public necessity. The public demand rapid transit, and it seems to be agreed by general consent that the speed of the old horse cars cannot be tolerated any more in a modern community, and people must accommodate themselves to it. There is necessarily danger in it, and it requires care by both parties—care on the part of the people running the car, and care on the part of the people living on the streets over which the cars run, and care in crossing the tracks. I think the court would have a right to say, in view of the evidence we have and what everybody knows, that a street car traveling at the rate of seven or eight or nine miles an hour is not traveling at a reck-

less rate of speed on an ordinary street.   There is the testimony of one man (and he claimed to be an expert) that it was running at the rate of fifteen to eighteen miles an hour.   Well, his testimony afterwards satisfied the court so thoroughly that he had no conception of what he was talking about, and it is so negatived by the other admittedly clearly proved facts in the case, that I do not think it is reliable on that point.   If the car had been traveling at that rate, and what he says happened, occurred, instead of stopping in a hundred and fifty feet, as he says, it would have been up to Western avenue and even to Irwin avenue before it stopped.   It is not possible unless you would repeal the laws of nature and mathematics and mechanics.   There is some other testimony, but I am satisfied from all the testimony that the car could not have been running over six or seven miles an hour after it left Fulton street.   It comes down then to the question as to whether or not the motorman exercised the proper care, skill and diligence after he saw the child, or should have seen it, in danger on the track, or about to go on the track.   If he did, that is all that is required.   If he did not, and the injury occurred on account of that fact, the defendant is liable.   On that point the evidence is very contradictory, and it is natural that it should be so.   There are a great many people who cannot tell accurately what they saw, and there are a great many people who swear to inferences.   While children are generally truthful, that is one of the defects in their testimony.   An illustration of it is seen in the testimony of two or three of these boys who were on the stand.   No doubt they meant to tell the truth but they undertook to testify what the child thought.   Of course he didn't think anything of the kind, he could not have the experience and competency to reason as they would have reasoned under like circumstances.   People see things in different lights.   Sometimes they forget, and there are men and women, and not a few of them, who cannot distinguish between what they see at one time and what they hear talked about at another time, by somebody else, and yet they are entirely honest.   You will have to, in the end, determine what the actual facts were.   There is no dispute of the fact that this car stopped at Fulton street and took on passengers.   The accident occurred on Pennsylvania avenue on the right hand track, the car being bound to Pittsburg.   If I recollect rightly, the dis-

tance between Fulton street and Frazier street is about four hundred and seventy or eighty feet in all. According to the testimony and the plan of the plaintiff, the car was stopped at a distance of two hundred and fifty-seven feet from Fulton street, that is, including what it ran after it struck the boy. Now, that is but a short distance in which to get a large headway, and that distance has a great deal to do with what would be the rate of speed. Fifteen miles an hour would be thirteen hundred and twenty feet in a minute, and a minute is a very short space of time. Half of that—seven and a half miles an hour—would be six hundred and sixty feet; so that at the rate of seven and a half miles an hour it would make the time between those two streets less than a minute. Now, it is not probable, it seems to me, that this car started up at full speed at once from Fulton street. If it had, before half the things that plaintiff's witnesses testified could have occurred, it would have been a long distance past the place of the accident.

The first witness who claims to have seen this child on the track was Mr. Puff. He tells us that he saw it go off the pavement, where it had been with the sister, walk across between the curbstone and the track, then walk across the track and get between the two tracks, stand and consider apparently, and then turn and go back on to the track. Now this was a child twenty-one months old. There is an inherent improbability in that, because the car would have come from Fulton street, where it had admittedly started from, before the child got out on the street, up to the point of the accident long before it could have done that. But he is contradicted by every witness in the case, both those for the plaintiff and those for the defendant. He is the only witness that pretends that the child got any further than between the two rails of the first track. It seems to me that the very large weight of evidence in this case shows that the child, in playing around, got separated from the sister; got off the curb, and toddled along until it got to the track. Whether it actually had passed over the rail, which seems to be the impression of most of the witnesses, or actually got on the track, I doubt whether any witness really knows, and it would not make very much difference whether it was over or not, but most of the witnesses say it had got over the first rail. Now while the cars are bound to run at a moderate rate of speed at

the crossings of streets, they can run properly much faster between streets. They must slack up when they get to a street crossing, because they are bound to anticipate that people will be crossing there, but they are not bound to anticipate that people will be crossing at other places. They are supposed to have the right of track there. They are bound, running at the rates they do, to keep a lookout for such a thing as this. They are hardly bound to anticipate that a grown man will run in there, but on the possibility of something happening, the motorman should keep a lookout ahead on his track to see what is coming. If he was running at the usual, ordinary rate, and we have told you there is no evidence to go beyond that, I am satisfied they were not running beyond what would be a fair rate at that particular point, then comes the question: He says that he saw the child get off the curb and go towards the track. Was he then so near that, in the exercise of a reasonable discretion, he should have anticipated that the child would go on until it got on the track, and that nobody there, and there seemed to be a number of persons there, would take charge of it; and was he so near that he could not by the exercise of ordinary care under the circumstances, which in the extreme danger was extreme vigilance, have stopped that car until he ran over the child. The witnesses differ very greatly in regard to the distance. Some witnesses for the plaintiff say that when the child got on the track the car was at the blacksmith shop or the plumbing shop. Two or three witnesses say that the car was at the plumbing shop, about one hundred and twenty-five feet away, when the child got down off the curb to go over. Now, I do not know what you may find, and it is for you, but I would have no trouble in finding that that child toddled along toward the track and was right at or on the track when it was struck. Two witnesses for the plaintiff say that they saw this. One, a colored man, was coming east, the way the car was coming. He knew the car was behind him, and he saw the child get down and go toward the track. He turned immediately, he said, and saw the car, and it was right on it, or close up to it, and he turned back to look at the child, and just as he turned back it was struck. The other colored man was working at the mortar bed along there, beyond the child, and was looking out for the car, because he was out in the street and had to get off the track in

time to let it go by, and he said it was close, when he saw the child not yet on the track. If I recollect rightly he does not fix any definite distance. My recollection is that he seemed to think the car was at the blacksmith shop at that time, or the telegraph post perhaps. Now Mr. McKinley says he was sitting in the car at the front end, on the same side that this child was on. He heard the alarm and then he looked out. He did not see the child until the car was within thirty feet, as he estimated it, of the child. Now of course the car would have run some distance while he was hearing the alarm and looking out. That would take time, and if the car was running at the rate of even seven and a half miles an hour it would be eleven feet a second—those things take very little time. And he says that just as the child stepped on to the rail, or over the rail, the car struck him. The motorman says that he was close up to it when he saw the child come off the curb; that he called out and rang the bell, and that he turned off the power and turned on the brake as fast as he could, and that he got the car stopped a few feet beyond where it struck the child. I think most of the witnesses who testified say that the child was taken out between the first and second wheels of the front truck; that the front wheel had run over him. It was evidently stopped not far from where the child was struck. Now the witnesses differ in regard to the proper manner of stopping a car. The motorman in this case says that he did not reverse the power; that he took off the power and applied the brake as being the best thing to stop it—both quicker and safer. The witnesses who may truly be called expert witnesses say that this is the proper way; that it is safer than undertaking to reverse the current; that they cannot use the brake if they reverse the current, and that it is quicker to use the brake. I refer to the testimony of Mr. Bruce and Mr. Hubbard, who are practical and scientific men, and who have given it study and experiment. On the other hand Mr. Smith, who thought this car was running at the rate of fifteen to eighteen miles an hour, says if a car like that was running at the rate of fifteen to eighteen miles an hour, that he could stop it twenty-five to thirty feet, and that he has done it. Now that car is twenty thousand pounds in weight, the momentum and force of a moving body is a compound of the weight and the rate at which it is going. Now you will be-

lieve what you think the testimony warrants, but at present I do not believe Mr. Smith's story. I think without something stronger than they have got now, it would tear the car apart to do it in that distance in the way he describes. Another witness—two of them perhaps—say that at the rate of ten to twelve miles an hour they could stop it in forty to fifty feet.

Now there is a good deal of other testimony; but the question is this: Did that motorman see the child in time to have stopped his car? I mean, see it go out onto the street, moving toward his track, in time to have stopped the car before it reached the child, in the exercise of the prudence and care and skill he should have exercised under the circumstances? If he did you find for the defendant. If he did not, then find for the plaintiff. If you find for the plaintiff you have to consider the question of damages.] [7]

Verdict and judgment for plaintiff for $4,750. Defendant appealed.

*Error assigned* among others was the [7] charge, quoting it.

*A. M. Neeper*, for appellant.—The charge was inadequate: Herrington v. Guernsey Bros., 177 Pa. 175; Lerch v. Bard, 177 Pa. 197.

There was no negligence shown: Flanagan v. People's Ry., 163 Pa. 102; Fleishman v. R. R., 174 Pa. 510; Funk v. Traction Co., 175 Pa. 564; Hestonville Ry. Co. v. Connell, 88 Pa. 520; Baltimore & Ohio Ry. Co. v. Schwindling, 101 Pa. 258; Phila. Trust Co. v. Phila., etc., R. R. Co., 177 Pa. 38.

The testimony with relation to the distance in which the car could be stopped has the vice detrimental to the defendant in that it is expert testimony, and not founded upon the facts adduced in evidence, and as the court found them with relation to the speed of the car. Such a method of submitting a case to a jury is erroneous: Phila. Trust Co. v. Phila., etc., R. R. Co., 177 Pa. 38; Peirson v. Duncan, 162 Pa. 187; Young v. Merkel, 163 Pa. 513; Herstine v. R. R., 151 Pa. 244.

*H. W. Mitchell*, with him *Walter Lyon* and *Charles H. McKee*, for appellee, were not heard, but in their printed brief said.— The testimony brings this case in line of Woeckner v. Erie

Electric Motor Co., 176 Pa. 451 ; Schnur v. Citizens Traction Co., 153 Pa. 29 ; Lenkner v. Citizens Traction Co., 179 Pa. 486 ; Harkins v. Traction Co., 173 Pa. 149.

PER CURIAM November 8, 1897 :

We find no substantial error in this record. The case was carefully and correctly tried, and submitted to the jury with full and adequate instructions of which the defendant company has no just reason to complain. There is nothing in either of the specifications of error that requires discussion. Neither of them is sustained.

. Judgment affirmed.